**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RANDY L. MORGAN, T/A/D/B/A )
CONCEPTS RESIDENTIAL )
DESIGN COMPANY, )
           )
      **Plaintiff,** )
           )
      **v.** ) **Civil Action No. 04- 1809**
           )
HAWTHORNE HOMES, INC., and )
HANNA HOLDINGS, )
           )
      **Defendants.** )

## OPINION

COHILL, D.J.

      Plaintiff Randy Morgan, trading and doing business as Concept Residential Designs, has

filed an amended complaint alleging eight counts of copyright infringement and one count of

breach of copyright license against defendants Hawthorne Homes, Inc. ("Hawthorne Homes") and

Hanna Holdings ("Holdings"). Defendants have counterclaimed for attorneys' fees and costs.

      Before the Court are the parties' motions for summary judgment with accompanying briefs

and documents. Plaintiff seeks partial summary judgment as to liability, with damages to be

determined at trial (Doc. 48). Defendants have filed a brief opposing this motion (Doc. 65).

Defendant Hanna Holdings has filed a motion for summary judgment (Doc. 61); Plaintiff has filed

a brief in opposition (Doc. 97), to which Hanna Holdings has replied (Doc. 107). Defendant

Hawthorne Homes has also filed a motion for summary judgment (Doc. 58); Plaintiff has filed a

brief in opposition (Doc. 96), and Hawthorne Homes has replied (Doc. 108).

      We have jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1338, and

17 U.S.C. § 101, and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

      We have previously determined, after special discovery, extensive briefing, and a hearing,

that two letters are not admissible because they cannot be authenticated. (Ex. 14 and 15 to Mem.

Op. dated May 21, 2007) (Doc. 157). We have also denied Defendants' motion to dismiss for lack

of subject matter jurisdiction, concluding that the amended complaint alleges claims arising under the Copyright Act, 17 U.S.C. § 106. (Memorandum Opinion and Order dated September 26, 2007) (Docs. 164 and 165).

Having now considered the submissions of the parties and the applicable law, for the reasons set forth below, plaintiff's motion for summary judgment will be denied, defendant Hawthorne Homes' motion for summary judgment will be granted in part, and defendant Hanna Holding's motion for summary judgment will be granted.

## I. Background

Unless otherwise indicated, the facts are not in dispute. Plaintiff's concise statement of material facts (F) and Defendants' response (R) guide our way.

Defendant Hanna Holdings, Inc. is a holding company with several wholly owned subsidiaries: Howard Hanna Real Estate Services; Howard Hanna Financial Services; Barristers Land Abstract Company; Howard Hanna Insurance Services; Bayard Crossings Corporation; Hawthorne Homes Company; Howard Hanna /Smythe, Cramer Company; and Barristers of Ohio LLC. (Pl.'s Ex. 2, Frederick Duffy Hanna Dep. at 2). Bayard Crossings purchases land and subdivides lots; Hawthorne Homes builds new houses on the subdivided lots; Howard Hanna Real Estate Services sells the new homes on the subdivided lots; Howard Hanna Mortgage Services lends money to finance the purchase of the new homes on the subdivided lots; Howard Hanna Insurance Services sells Home Owners Insurance for the new homes on the subdivided lots; and Barristers Land Abstract Company sells title insurance and home closing services for the new homes on the subdivided lots.

In December of 1999, Hanna Holdings entered into an agreement for the purchase of the assets of Seven Fields Development Corporation ("Seven Fields"). Those rights of purchase were assigned to Bayard Crossings and Hawthorne Homes Company. Bayard Crossings purchased the undeveloped lots and Hawthorne Construction (later renamed Hawthorne Homes Company) purchased the construction in progress, construction equipment, drawings, and other items.

2

Hawthorne built homes utilizing plaintiff Morgan's drawings

Darryl Craig was deposed as defendant Hawthorne Homes' designated witness. Craig was the chief operating officer for Seven Fields from 1991 until 2000, when Howard Hanna bought the remaining Seven Fields' residential assets and Craig began working for the Hawthorne Homes and Baird Crossings divisions of Howard Hanna. (Pl.'s Ex. 1, Craig Dep. at 6).

Morgan was hired by Seven Fields in the fall of 1991 to draft plans for houses. (F3). The parties dispute whether Morgan is a home designer (F2) or a draughtsman. (Craig dep). Seven Fields had seen his work and liked his designs. (F4). Morgan was to put design concepts in a suitable form, dimension-wise and elevation-wise, for construction. (F5).

While working for Seven Fields, Morgan drew multiple plans, including the following: Bedford I and II, Berkshire I and II, Bradford, Cambridge I and II, Cheshire, Connor I, Essex, Georgian, Hampton I and II, Kent I and II, Lancaster, Nashville, Oakmont I and II, Oxford I and II, Saxony, Stafford I and II, Wainscott, Wellington, Wilshire, and York I. (F7-8). All of the plans were drawn by hand. (F6).

During the course of Morgan's work, representatives of Seven Fields went to Maryland, Virginia, and Georgia to get ideas from builders of products that could be adapted for Seven Fields. (F9). After collecting brochures from other builders in other markets, Seven Fields would take various ideas from the brochures, meet with Morgan and ask him to develop a similar product. (Craig Dep. at 43). Craig testified that Seven Fields presented ideas and Morgan did the drawings. (Craig Dep. at 52).

Morgan was paid per square foot. (Craig Dep. at 10). Craig testified that "whenever I needed to have a house drawn, I would call him and we would meet and talk about what it was that I wanted to have drawn and, you know, he would do it on a piecemeal basis, you know on a verbal agreement to do a house at a time." (Craig Dep. at 12). Morgan provided his drawings on mylar, which is used to make blueprints. (Craig Dep. at 25).

Morgan was paid by Seven Fields. Craig explained that "it was a payment, but it was not a

3

paycheck as an employee would get." (Craig Dep. at 16). At the end of the year, Morgan was given a 1099 form for tax purposes, not a W-2. *Id.* Morgan was paid for every drawing he did for Seven Fields. (Craig Dep. at 30). Craig considered Morgan to be an independent contractor. (Craig Dep. at 12). He emphasized that Morgan was not an employee of Seven Fields: "[Y]ou asked if he was an employee of Seven Fields Development, and he very clearly never was. . . . I just want to make sure that it's very clear that at no time was he ever an employee of Seven Fields Development Company or Hawthorne Homes." (Craig Dep. at 18). Craig stated that Morgan was an independent contractor. Craig Dep. at 19.

Howard Hanna Company had provided marketing services for Seven Fields. In December 1999, Hanna Holdings negotiated an agreement with Seven Fields to buy that company's remaining assets in January 2001. (Lloyd Dep. Defs.' Ex. C at 3). Bayard Crossings purchased the lots, and Hawthorne Construction (which became Hawthorne Homes) purchased construction-in-progress, construction equipment, and drawings. (Lloyd Dep. at 2). David Lloyd, treasurer of Hanna Holdings, asked Craig if Hawthorne owned the drawings and if Hawthorne could build the houses as many times as it wanted to. (Lloyd Dep. at 20-25). He was assured that Hawthorne owned them and the houses could be built. *(Id.)*

In 2000 Morgan started performing work for Hawthorne Homes. He was still paid per square foot for single family homes, and per unit for townhouses. (Craig Dep. at 17). There was no employment agreement, and Craig emphasized in his deposition that Morgan was not an employee. (Craig Dep. at 18).

At some point, Hawthorne Homes stopped paying Morgan for his services. Craig testified that this was because "[w]e were not building any product that he could supply drawings for." (Craig Dep. at 33). Craig explained that Hawthorne Homes was going to a computerized system, and that Morgan lacked this expertise. (Craig Dep. at 30 - 35).

Fred Baehr was an architect who worked with Seven Fields and Hawthorne Homes as an independent contractor. (Pl.'s Ex. 7, Baehr Dep. at 6, 12). He worked with Morgan as a consultant

4

or contractor, reviewing drawings for code compliance and providing an architectural seal when necessary for permitting. (Baehr Dep. at 12). After the acquisition, Hawthorne Homes president Darrell Craig hired Baehr to copy designs into a computer. Baehr recognized some drawings as Morgan's. Baehr asked for assurance that Hawthorne Homes owned the designs, and Darrell Craig said that it did. (Baehr Dep. at 42-43).

Drawings for eight plans are at issue here. The certificate of registration for each plan is attached to the amended complaint. Certificates provide the dates of first publication and copyright registration, as well as whether the drawing is a "work made for hire" and a technical drawing and/or architectural work. The name of the author at part 2(a) of each certificate is "Concept Residential Design Company." Each certificate is signed by Randy L. Morgan as the author. (Pl.'s Ex. 2, 3, 9, 10, 12, 14, 15, and 20). We note that in each case, the registration occurred years after initial publication.

Count I alleges that Defendants have infringed copyrighted plans for the "Bedford" plans by making copies of the plans (Compl. ¶ 14); identifying the design on their website (Compl. ¶ 13); and building the homes in several locations (Compl. ¶ 16). These drawings were first published on 6/30/95 and copyrights were registered on 4/12/04. The certificate of registration for the Bedford states that this was a work made for hire, and is both a technical drawing and an architectural work. (Pl.'s Ex. 2).

Count II alleges that Defendants have similarly infringed Plaintiff's copyright for the "Bedford/ Lot 30" plans. (Compl. ¶¶ 20-22). These drawings were first published on 6/30/95 and copyrights were registered on 4/12/04. The certificate of registration for Bedford/Lot 30 states that this was a work made for hire and an architectural work. (Pl.'s Ex. 3).

Count III alleges that Defendants have similarly infringed the "Cambridge" plans. (Compl. ¶¶ 27-29). This drawing was first published on 6/30/94, and registered on 7/13/04. The certificate of registration states that this was a work made for hire, and a technical drawing. (Pl.'s Ex. 9).

Count IV alleges that Defendants have similarly infringed the "Hampton" plans. (Compl. ¶¶

5

33-35). This drawing was first published on 6/30/94, and registered on 7/13/04. The certificate of registration states that this was a work made for hire, and a technical drawing. (Pl.'s Ex. 10).

Count V alleges that Defendants have similarly infringed the "Kent" plans. (Compl. ¶¶ 40-42. This drawing was first published on 6/30/92, and registered on 4/12/04. The certificate of registration states that this was a work made for hire, and both a technical drawing and an architectural work. (Pl.'s Ex. 12).

Count VI alleges that Defendants have similarly infringed the "Oxford I" plans. (Compl. ¶¶ 47-49). This drawing was first published on 6/30/94, and registered on 7/13/04. The certificate of registration states that this was a work made for hire, and a technical drawing. (Pl.'s Ex. 14).

Count VII alleges that Defendants have similarly infringed the "Wainscott Lot 324" plans. (Compl. ¶¶ 53-55). This drawing was first published on 6/30/90, and registered on 4/12/04. The certificate of registration states that this was a work made for hire, and a technical drawing. (Pl.'s Ex. 15).

Count VIII alleges that Defendants have similarly infringed the "York I" plans. (Compl. ¶¶ 60-61). This drawing was first published on 6/30/89, and registered on 4/12/04. The certificate of registration states that this was a work made for hire, and a technical drawing. (Pl.'s Ex. 20).

The drawings have a title block that states: "© Concept Residential Design Co.," and the certificates of registration identify the author as "Concept Residential Design Co."

Plaintiff alleges that Defendants have infringed on his copyrights and continue to infringe by copying his work on their website without authority to do so. (Compl. ¶ 7).

Count IX alleges breach of Plaintiff's copyright license. Plaintiff alleges that he granted Seven Fields Development Corporation, where he was employed as an independent contractor, a limited license to use the designs he created. (Compl. ¶¶ 69-70). Each drawing also includes the following:

> The purchaser of these plans is given a limited license to reproduce these plans for construction purposes only and any other further distribution and or transfer is strictly prohibited unless given expressed permission.

6

## II. Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1988). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court considering summary judgment must examine the entire record in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). The court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (*quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

The moving party bears the initial responsibility for demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. This burden may be met by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. However, once the moving party has properly supported its motion, the opponent must provide some evidence that a question of material fact remains for trial. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet this burden, the non-moving party may not rest upon mere allegations, general denials, or vague statements. *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993). The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matushita*, 475 U.S. at 586. In other words, the non-moving party must go beyond the pleadings and show, through its own affidavits or by the depositions, answers to interrogatories and admissions on file, the specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

> The summary judgment standard does not change when, as here, the parties
> have filed cross-motions for summary judgment. *See Appelmans v. City of Phila.*,

> 826 F.2d 214, 216 (3d Cir.1987). Cross-motions for summary judgment are no
> more than a claim by each side that it alone is entitled to summary judgment, and
> the making of such inherently contradictory claims does not constitute an
> agreement that if one is rejected the other is necessarily justified or that the losing
> party waives judicial consideration and determination whether genuine issues of
> material fact exist.

*Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir.2001) (*citing*

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968)). If review of cross-motions for

summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor

of the party deserving of judgment in light of the law and undisputed facts. *See Iberia Foods Corp.*

*v. Romeo Jr.*, 150 F.3d 298, 302 (3d Cir.1998) (*citing Ciarlante v. Brown & Williamson Tobacco*

*Corp.*, 143 F.3d 139, 145-46 (3d Cir.1988)).

## III. Analysis

Plaintiff has filed a motion for partial summary judgment on the question of liability;

Morgan seeks summary judgment in his favor that he owns valid copyrights to the drawings and

that his copyrights have been infringed by the Defendants. Defendants Hawthorne Homes and

Hanna Holdings have filed motions for summary judgment.

### A. Does Plaintiff Hold a Valid Copyright?

All motions require that we consider whether Morgan holds a valid copyright and whether it

was infringed. To establish a claim of copyright infringement, a plaintiff must show "(1) ownership

of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*

*Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). Whether a work is subject to

copyright protection is a matter of law for the court to decide. *Graham v. Haughey*, 430 F.Supp.2d

458, 465 (E.D. Pa. 2006).

As discussed supra, each of the drawings at issue in this case was registered in 2004;

registration is a prerequisite to bringing suit for copyright infringement. 17 U.S.C. § 411.

However, the drawings were first published well before they were registered. A certificate of

registration obtained "before or within five years after first publication of the work shall constitute

8

prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Such certificate creates a rebuttable presumption . . . . "A certificate of registration obtained within the proper timeframe is *prima facie* evidence that the work contains copyrightable material and is original to the author." *Graham v. Haughy*, 430 F.Supp.2d at 468. A certificate of registration obtained after five years eliminates the presumption of validity, and the "evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410 (c). However, it is undisputed that Morgan did not register any of his copyrights within five years of publication.

Defendant Hawthorne Homes argues that regardless of our consideration of this failed presumption, plaintiff does not have a valid copyright for any of the eight designs at issue here. Two of those designs, the York and Wainscott plans, were published prior to December 1, 1990, and Defendants assert that these cannot be copyrighted under the statute. However, this is an incorrect statement of the law. Drawings published before December 1, 1990 are eligible for copyright protection as technical drawings, under the definition of "[p]ictorial, graphic, and sculptural works." 17 U.S.C. § 102 (a) (5). The statute was amended as of December 1, 1990 by the Architectural Works Copyright Protection Ace ("AWCPA"), which added "architectural works" to the definitions of protectible works and brought the United States into compliance with the Berne Convention. 17 U.S.C. § 102 (a) (8). Morgan registered these copyrights as technical drawings, as required by the statute at the time.

However, the defendant is correct in arguing that there is no presumption of copyrightability for these designs because they were published more than five years before the copyrights were registered. The other plans were published prior to July 1, 1995, but were not registered until April 2004; under the statute there is no presumption of copyrightability for these designs because they were registered more than five years after publication. Morgan has provided certificates of registration for each of these designs. There is no evidence in the record to contradict the dates on the certificates of registration. Thus there is no presumption of validity, and he must show that they

9

are valid. Where the timing of copyright registration is such that there is no presumption of validity, the court has discretion to decide what evidentiary weight the certificates deserve. 17 U.S.C. § 410 (c).

Defendants argue under several different theories that we should conclude that the copyrights are nevertheless invalid.

### 1. Prior publication in the public domain

First, Hawthorne Homes cites 17 U.S.C. § 405 (a) for the proposition that Morgan forfeited any copyrights because he failed to put a copyright notice on his works when they were originally published. This is not a correct statement of the current law. Section 405(a), entitled Effect of Omission on Copyright, is restricted to copies distributed before the effective date of the Berne Convention Implementation Act of 1988, which amended the Copyright Act of 1976 and became effective on March 1, 1989. 17 U.S.C. § 405 (a); *Harris Custom Builders, Inc.*, 92 F.3d 517, 518-19 (7th Cir. 1996). Claims arising before that date are governed by the provisions of the unamended Act, and in such circumstances the owner of the copyright was required to comply with notice formalities when a work was published or with one of the savings clauses, or forfeit the copyright.

We do not have such a case. Each of the eight plans at issue were published after March of 1989, and therefore any omission of notice does not result in forfeiture and provides no basis for finding that Plaintiff does not have a valid copyright in the eight plans.

We will deny Hawthorne Homes' motion for summary judgment as to this issue.

### 2. Work made for hire

Hawthorne Homes further asserts that Morgan cannot own a valid copyright in any of these plans because the evidence, including the copyright registration certificates, show that the plans are works made for hire. Defendant argues that Seven Fields directed this work; therefore it owned the copyright and could transfer it to Hawthorne Homes.

Plaintiff explains that he created the works for his own company, Concept Residential Design, and that he was an independent contractor to Seven Fields and Concept Residential Designs

10

retained the copyright.

Section 201, which addresses ownership of a copyright, provides in pertinent part:

> (a) Initial Ownership. – Copyright in a work protected under this title vests initially in the author or authors of the work. . . .
>
> (b) Works Made for Hire. – In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201.

The Act defines a work made for hire as "a work prepared by an employee within the scope of his or her employment(.)" 17 U.S.C. § 101(1). Work made for hire may also be created by an independent contractor, as "a work specially ordered or commissioned" under one of nine categories: work "specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas (.)" 17 U.S.C. § 101(2). Moreover, even if a work falls into one of these categories, it will only be regarded as a work made for hire if the parties have "expressly agree[d] in a written instrument signed by them" that the work shall be so considered. 17 U.S.C. § 101. Plaintiff's drawings do not fall within these criteria, and there is no evidence of such an agreement.

At issue here, then, is whether Morgan prepared the drawings as an employee of Seven Fields, as Defendants argue, or, as he maintains, as an independent contractor.

The status of an independent contractor versus that of an employee is determined by the general common law of agency. *Community for Creative Non-Violence ("CCNV") v. Reid*, 490 U.S. 730, 751 (1989). In making this determination, the Supreme Court has directed us to the nonexhaustive list of factors from the Restatement of Agency, § 220(2). *CCNV*, 490 U.S. at 752. Factors to be considered include:

> the hiring party's right to control the manner and means by which the product is accomplished. . . actual control over the details of the work, the hired party's occupation, local custom, the skill required, source

11

> of tools, work location, length of employment, the right to assign more work, the hired party's discretion over work hours, payment method, the regular business of the hiring party, the parties' understanding, the hiring party's role in hiring assistants, tax treatment, employee benefits, and whether the hiring party is in business.

*Marco v. Accent Pub. Co. Inc.*, 969 F.2d 1547, 1550 (3d Cir. 1992); *CCNV*, 490 U.S. at 752.

With these factors in mind, plaintiff points to the following evidence. Morgan worked from home, on his own schedule, and supplied his own tools. He worked for Seven Fields for a number of years, but only on a project-to-project basis and in between he worked for another construction contractor. Local custom is such that some home designers work independently. Fred Baehr recognized the subject drawings as belonging to Randy Morgan, and, initially, refused to copy them into a computer for that reason; the drawings have a title block that states: "© Concept Residential Design Co.;" the certificate of registration identifies the author as "Concept Residential Design Co.;" and Plaintiff and Darell Craig have testified that Morgan was not a direct employee of Seven Fields but was an independent contractor. (Pl.'s Ex. 1, Craig Dep. at 12; Pl.'s Ex. 16, Morgan Aff. at 1; Pl.'s Ex. 18, Morgan supplemental Aff.). On the other hand, there is no dispute that on the certificates of registration form, Morgan indicated that the work for which he was applying for a copyright was a "work made for hire."

We are persuaded by Darell Craig's testimony. Craig was the chief operating officer for Seven Fields from 1991 until 2000, when Howard Hanna bought the residential assets remaining from Seven Fields. He hired Morgan to draft houses. Craig testified as Hawthorne Homes' designated witness that "whenever I needed to have a house drawn, I would call him and we would meet and talk about what it was that I wanted to have drawn and, you know, he would do it on a piecemeal basis, you know on a verbal agreement to do a house at a time." (Craig Dep. at 12). At the end of the year, Morgan was given a 1099 form for tax purposes, not a W-2. *Id.* Craig intended Morgan to be an independent contractor. *Id.*

Furthermore, Craig emphasized that Morgan was not an employee of Seven Fields: "[Y]ou asked if he was an employee of Seven Fields Development, and he very clearly never was. . . . I just

want to make sure that it's very clear that at no time was he ever an employee of Seven Fields Development Company or Hawthorne Homes." (Craig Dep. at 18). Craig stated that Morgan was an independent contractor. *Id.* at 19.

Craig's unequivocal testimony establishes that Morgan worked for Seven Fields, and, later, for Hawthorne Homes, as an independent contractor. Defendant Hawthorne Homes argues that under the factors set out in *CCNV* we must reach the opposite conclusion, but we find that these factors are more favorable to Plaintiff's position. Craig told Morgan what sort of house Seven Fields wanted, gave him a design concept, and Morgan put it on paper within an agreed-upon turnaround time, usually two to three weeks. "The final product was to be a dimensioned house with adequate detail, dimension-wise, to construct it in Seven Fields." (Craig Dep. at 10-11). Financially, Seven Fields did not treat him as an employee. He was paid by the job, per square foot, and Seven Fields issued him a form 1099 at the end of the tax year instead of the W2 form it provided for its employees. Seven Fields did not provide Morgan with employee benefits. There is no indication that Seven Fields considered Morgan to be an employee of the company. It is clear to us that Morgan worked for Seven Fields as an independent contractor, and that there are no facts from which a reasonable jury could conclude otherwise.

We conclude that Morgan's plans were not created as a work made for hire for Seven Fields, and that this is not a basis for denying that Morgan t/d/b/a Concepts Residential Designs has established a valid copyright in the plans at issue. Hawthorne Homes' motion for summary judgment will be denied as to this argument.

### 3. No presumption of originality

For a copyright to be valid the subject matter must be copyrightable and the work must be sufficiently original. *Kamar Int'l Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1061 (9th Cir. 1981). But, under the Copyright Act, the term "originality" means "only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).

13

"[A]ll that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'" *Alfred Bell & Co., v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102-3 (2d Cir. 1951). As one court stated, "[p]ractically speaking, because the degree of creativity required is so low, the originality requirement amounts to 'little more than a prohibition of actual copying.'" *Axelrod & Cherveny Architects, P.C., v. Winmar Homes*, 2007 WL 708798 *9 (E.D. N.Y.2007) *citing Alfred Bell & Co.*, 191 F.2d at 103. Nevertheless, where the defendant offers proof that plaintiff copied from other works, the burden shifts to the plaintiff to prove originality. *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504 (1st Cir. 1996).

Hawthorne argues that there is sufficient evidence to show that plaintiff's drawings lacked originality. For example, Morgan admitted that he had access to other works when preparing the drawings and that some of his work appears to be similar to prior works. Hawthorne points to the opinion of a licensed architect who has opined that Morgan's works are simply "a copy and compilation of long established precedents widely used in housing design." (R. Ex. O). Upon proof by a defendant that plaintiff had access to similar prior works, the burden of proving originality shifts back to the plaintiff. *Midway Manufacturing Co. v. Bandai-America, Inc.*, 546 F. Supp. 125 (D.N.J. 1982). According to Morgan, he was provided primitive sketches of the look and floor plans for the kind of house that was to be designed, and was asked to design a cost effective home that would be attractive to the local housing market.

We find that there exist genuine issues of material fact with respect to Morgan's alleged copying from prior sources, and will deny the defendant's motion for summary judgment on this particular issue.

> What if copying [on the part of the defendant] is found or assumed, but the defense is that plaintiff's work itself lacked originality because copied from prior sources? That inquiry almost always involves a triable issue of fact, therefore precluding summary disposition when one party seeks trial on the issue.

Nimmer on Copyright § 12.10[B][1]. Plaintiff has brought forth evidence (and indeed the designs

14

themselves arguably show) that his work was a result of his independent creation and exhibit a minimal degree of creativity, despite the existence of similar designs at the time they were created. (Br. In Opp. Of Def. Hawthorne's M. For Summ. J. (Doc. 96) at 29-33).

As one court stated, "[t]o be eligible for copyright protection, "an architectural work must exhibit some modicum of creativity. . . . The architectural work need not be novel; bluntly, the vast majority of works qualify, "no matter how crude, humble, or obvious." *Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F. Supp. 1228, 1232 (D.N.J. 1992).

Defendant Hawthorne argues that Morgan is not a copyright author because Fred Baehr made the changes which enable the plans at issue to be utilized, thus making Baehr, not Morgan, the author of the final work product. We find that there is a genuine issue of material fact as to whether Morgan was the author because there is ample evidence to show that he did more than a rote or mechanical transcription of the brochure and drawings provided for him by the defendant. He arguably was the one who translated the idea into a fixed, tangible expression entitled to copyright protection. Morgan has presented evidence that Baehr reviewed his designs and added structural and building code detail but he did not change Morgan's designs. These questions are for the trier of fact.

### 4. Laches

Hawthorne Homes also argues that Plaintiff's claims for equitable relief are barred by laches. Laches is an equitable doctrine addressed to the sound discretion of the district judge. *Univ. of Pittsburgh v. Champion Prods., Inc.,* 686 F.2d 1040, 1045 (3d Cir.1982), *citing Gruca v. United States Steel Corp.*, 495 F.2d at 1258). Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay. *Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005).

Hawthorne has provided evidence that Morgan communicated his belief that infringement was allegedly occurring as early as 1997. This evidence includes, *inter alia*, a letter to Darrell Craig dated September 20, 1997, in which Morgan alleges that his drawings were copyrighted, could not

15

be used without his permission, and that Hanna was unlawfully distributing them. Hawthorne argues that Morgan's infringement complaints in 1997 placed a duty on Morgan to monitor defendants' activities and bring suit promptly if infringement was occurring. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001). Hawthorne argues that it was prejudiced by this delay because there is lost, stale, or degraded evidence, in the form of plaintiff's inability to produce lost invoices and tax documents. Hawthorne additionally argues that it suffered economic prejudice by the delay because the home designs which Morgan claims were infringed upon resulted in the building of multiple homes after Morgan could have promptly brought suit. Hawthorne argues that it would be inequitable to allow Morgan to wait for seven years and then profit from the investment Hawthorne made in building homes.

In response to defendant's arguments, plaintiff notes that Hawthorne Homes paid him for his drawings of individual homes until October, 2001 and townhouses until January, 2003. It was not until May of 2003 that Morgan complained of the lack of work and speculated that the corporations tried to save money by using the designs they already had. Morgan applied for copyright registrations on April 12, 2004 and July 13, 2004, and filed this lawsuit on November 24, 2004. Thus, he argues there was no "inexcusable delay." With respect to the 1997 letter to Darrell Craig concerning drawings "magically" leaving the offices of Seven Fields Development, Morgan argues that this does not give rise to a claim of inexcusable delay because this incident concerned the use of Morgan's drawings by another, non-party builder, not the defendants herein. When confronted at the time, Darrell Craig denied having any part in it and the issue appears to have been dropped. At that point Morgan continued to produce drawings which the defendants then used. Morgan alleges that Craig's alleged concealment of wrongdoing, as well as Morgan being lead to believe that he would be hired directly by Howard Hanna, excuses his delay in filing suit.

Hawthorne's arguments as to prejudice are compelling, and it appears that Hawthorne has very nearly met its burden. Seven Fields is no longer in business. Certain key pieces of evidence are missing, most notably, evidence of whether Morgan was paid for his work. There are numerous

16

communications which show that Morgan may have believed that infringement was occurring, but took no action to protect his rights. Nevertheless, at this point in this litigation, we must find that there are genuine issues of material fact with respect to the defense of laches. A mere false sense of security instilled in defendant as a result of plaintiff's delay, absent a change of position in reliance thereon, does not give rise to laches. *Russell v. Price*, 612 F.2d 1123 (9th Cir. 1979). Accordingly, we will deny Hawthorne's motion for summary judgment as to Morgan's claims for equitable relief on the grounds of laches.

## B. Copyright Infringement

Having determined that Plaintiff has produced evidence to support his claim that he holds a valid copyright to these eight plans, we turn now to his assertion that Defendants infringed his copyrights. Defendants' brief in opposition denies this claim, and Defendants' respective motions for summary judgment assert that there has been no infringement.

Under the Copyright Act, an infringer is one who "violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118." 17 U.S.C. § 501(a). In pertinent part, Section 106 provides that the owner of the copyright has "exclusive rights" to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies . . .

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . ... .

17 U.S.C. § 106.

Plaintiff asserts that there is no disputed issue of material fact that Morgan owns the copyrights, and that Hawthorne Homes infringed said copyrights by having Fred Beahr copy the drawings into a computer and then manufacturing at least 49 homes from the drawings. Plaintiff argues that the original copying violated section 106(1), and Beahr's adding additional details resulted in a "derivative work" in violation of section 106 (2). Distribution to builders for the

17

construction of new homes was in violation of section 106 (3), and the construction of the new homes violated section 106 (1).

### 1. Web site

Morgan further claims that the defendants "have infringed on Mr. Morgan's copyrights and continue to infringe on his copyrights by copying his work on their web cite without authority to do so." Amended Complaint ¶ 7. In response, Hawthorne argues that pictorial representation of an architectural work does not constitute infringement. 17 U.S.C. § 120(a) states:

§ 120. **Scope of exclusive rights in architectural works**

**(a) Pictorial representations permitted.**--The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.

Thus, Hawthorne argues that with respect to the public display of the buildings on its website, because the houses are ordinarily visible from a public place, plaintiff has no claim. Morgan admits that houses were constructed using his plans and are ordinarily visible from a public place. He explains, however, that this section of the statute clearly relates to architectural works; he argues that it does not apply to "technical drawings." According to plaintiff, he has a copyright in both the architectural work and the technical drawings. We find that to the extent that Morgan seeks damages for the copying of his work on their web site, as to the plans which were registered as architectural works only (Bedford Lot 30) he has no claim. See Amended Complaint at Pl.'s Ex. 3. We will therefore grant Hawthorne's motion for summary judgment in part and find as a matter of law that Hawthorne (and also, therefore, Hanna Holdings) did not infringe on any copyright with respect to the pictorial representation of the architectural work Bedford Lot 30 on its website (Count III).

### 2. Useful Article Exception

In response to defendant's argument, plaintiff argues that five of his drawings are only

registered for copyright protection as "technical drawings" under § 102(a)(5) and not as "architectural works" under § 102 (a)(8). This raises another legal issue. Hawthorne argues that a person who owns a copyright in a technical drawing cannot prevent anyone from producing the item depicted in that drawing, arguing that the copyright law excludes from its protection "useful articles" pursuant to 17 U.S.C. §§ 101, 102(a)(5). Defendant argues that the copyrights for these five technical drawings (Cambridge, Hampton, Oxford, Wainscot and York home plans) (Counts III, IV, VI, VII, and VIII) cannot be infringed by constructing homes from these plans, because they are copyrighted as technical drawings, rather than architectural works. According to Hawthorne, had Morgan registered those drawings as architectural works under the Architectural Works Copyright Protection Act ("AWCPA"), he may have had the protection he now seeks.

Architects typically protect their works through copyright because the utilitarian nature of architectural drawings and buildings makes it difficult for architects to satisfy patent law's novelty requirement. *See Robert R. Jones Assocs. v. Nino Homes,* 858 F.2d 274, 278 (6th Cir. 1988). Until 1990, architectural works could be registered only as "technical drawings" under the category of "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). In 1990, Congress enacted the AWCPA, which extended copyright protection to "architectural works" as a new category of authorship. 17 U.S.C. 102(a)(8); 1 Nimmer, supra, § 2.20. The primary effect of the AWCPA is to provide copyright protection to physical architectural works. *Guillot-Vogt Assoc., Inc. v. Holly & Smith,* 848 F.Supp. 682, 686 (E.D. La. 1994). The enactment of the AWCPA did not affect the scope of copyright protection afforded to architectural works registered only as technical drawings. *See id.* (quoting H.R.Rep. No. 101-735, at 19 (1990), reprinted in 1990 U.S.C.C.A.N. 6935, 6950). A work can obtain protection as both an architectural work and a technical drawing only if the work is registered under both categories. *See* 37 C.F.R. § 202.11(c)(4).

Further, under the "more expansive definition" given to architectural plans in the AWCPA, "the holder of a copyright in an architectural plan ... has two forms of protection, one under the provision for an 'architectural work' under 17 U.S.C. § 102(a)(8), and another under the provision

19

for a 'pictorial, graphical, or sculptural work' under 17 U.S.C. § 102(a)(5)." *Id.* at \*27.

The parties do not genuinely dispute that architectural drawings are subject to copyright protection. Although the Copyright Act of 1976 (the "Act") did not explicitly protect architectural drawings, courts have understood the Act to protect such drawings under the Act's protection of "pictorial, graphic and sculptural works," 17 U.S.C. § 102(a)(5) (1982), which was defined to include "technical drawings, diagrams, and models," *Id.* § 101. E.g., *Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 278 (6th Cir.1988). This interpretation was consistent with, and followed from, clear congressional intent that such architectural plans be protected by the Act. E.g., H.R.Rep. No. 94-1476, at 55 (1976) ("An architect's plans and drawings would, of course, be protected by copyright...."), reprinted in 8 Melville B. Nimmer & David Nimmer, Nimmer on Copyright app. 4, at 20 (2001). In 1988, the Act was amended expressly to include within its ambit architectural plans. Berne Convention Implementation Act of 1988, Pub.L. No. 100-568, § 4(a)(1)(A), 102 Stat. 2853, 2854. This amendment was understood by Congress merely to codify the pre-existing protection afforded to architectural plans. *See, e.g.*, S. Rep. No. 100-352, at 8, 39 (1988), reprinted in 9 Nimmer & Nimmer, *supra*, app. 35, at 11, 55. At all times relevant to this dispute, therefore, the drawings at issue here were amenable to copyright protection.

Section 101 defines a "useful article" as an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. 17 U.S.C. § 101. The useful article exception to protection was explained by the court in *Eliya, Inc. v. Kohl's Dept. Stores*, 2006 WL 2645196 (S.D.N.Y. 2006) as follows:

Any work that has "an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information"-such as a shoe-is not granted the protection of copyright. *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005), quoting 17 U.S.C. § 101. This limitation is based on the well-accepted "notion that functional items are not eligible for the relatively longterm protections of copyright." Id. at 328. Accordingly, an etching of a shoe, which has no utilitarian function and is simply an artistic rendering of a physical object, can be copyrighted, while an actual shoe cannot be. As a necessary consequence, ownership of a copyright in a pictorial representation of a useful article does not vest the owner of the picture with a derivative copyright in the useful article itself. If such roundabout copyrighting were permitted, copyright law's exclusion of useful articles would be eviscerated, because any useful article could be copyrighted

by merely obtaining a copyright for a two-dimensional representation of the article.

Useful articles serve purposes independent of expression and, whether standing alone or incorporated into a previously copyrighted design, cannot be validly registered as enforceable copyrights. *See Feist Publ'ns, Inc. v. Rural Tel. Service Co., Inc.*, 499 U.S. 340, 345-56 (1991)

The starting point for analyzing the scope of copyright protection extended to works depicting useful articles is the seminal case of *Baker v. Selden*, 101 U.S. 99, 11 Otto 99, 25 L.Ed. 841 (1879). In *Baker*, the plaintiff had published a book outlining a unique bookkeeping system which included blank forms that illustrated how to apply the system. *Id.* at 100. The defendant created duplicates of the forms illustrated in the books. *Id.* According to the plaintiff, the forms sold by the defendant infringed on the plaintiff's copyright in the book. The Court held that copyright protection extends to the particular explanation (otherwise termed expression) of an art or work, but not to the use of the art or work described in the copyrighted material. *Id.* Further, the Court held that, if an art taught by a copyrighted work requires the use of methods and diagrams illustrated in the work, such use does not infringe on the copyright. *Id.* at 103. Baker bases its distinction between expression and use on the fundamental differences between copyright and patent law. *Richmond Homes Management, Inc. v. Raintree, Inc.*, 862 F.Supp. 1517, 1527 (W.D. Va. 1994). Copyright law protects an author's original expression, but does not give the author the exclusive right to use the ideas expressed in the author's work. *Baker*, 101 U.S. at 102, 11 Otto 99. An author may only obtain protection for the ideas expressed by obtaining a patent. *Id.*

As of the enactment of the AWCPA, the circuits had not developed a uniform method of applying *Baker* in the context of architectural plans, and given that most cases are now decided under the AWCPA, little thought has been given to the subject. Generally, courts have found that an unauthorized copy of an architectural plan infringes on a technical drawing copyright. *Richmond Homes*, 862 F.Supp. at 1527; *Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 899-900 (5th Cir.1972); *Demetriades v. Kaufman*, 680 F.Supp. 658, 662 (S.D. N.Y. 1988). Further, most courts agree that copying a structure depicted in plans, without copying the plans themselves, is not

21

copyright infringement. *Richmond Homes*, 862 F.Supp. at 1527; *Acorn Structures, Inc. v. Swantz*, 657 F.Supp. 70, 74 (W.D.Va.1987) *rev'd on other grounds* by 846 F.2d 923 (4th Cir.1988) (unpublished); *Desilva Constr. Corp. v. Herrald,* 213 F.Supp. 184, 195 (M.D.Fla.1962); *Muller v. Triborough Bridge Auth.*, 43 F.Supp. 298, 300 (S.D.N.Y.1942). The copyright implications when a party uses an infringing copy to build a structure are less clear. *Richmond Homes*, 862 F.Supp. at 1527. In an attempt to make up for a perceived insufficiency in copyright law's protection of architectural structures, some courts have calculated damages so as to include profits realized from the construction of works using infringing copies of technical drawings. *See Robert R. Jones Assocs.*, 858 F.2d at 280. Other courts have found that a technical drawings copyright simply does not give the owner the exclusive right to build the structure depicted in the plan, and a copyright owner has no claim against another who builds the structure from an infringing plan. *DeSilva*, 213 F.Supp. at 195.

Nevertheless, there is a long line of cases to support the defendants' position that a valid copyright protects design drawings from being copied, but does not prevent the construction of buildings based on those plans. *Oravec v. Sunny Isles Luxury Ventures*, 469 F.Supp.2d 1148 (S.D.Fla. 2006) (citing cases). In *National Medical Care, Inc. v. Espiritu*, 284 F.Supp.2d 424, 433-35 (S.D. W. Va. 2003), the court concluded that building a structure depicted in a pictorial, graphic or sculptural work did not amount to infringement; only the drawings themselves are protected from copying. In so holding, the court stated that "[c]opyright protection only extends to as-built structures when the copyright is registered [as 'architectural work'] under the AWACPA." *Id.* at 435. Thus, Hawthorne argues correctly that while one may construct a house which is identical to a house depicted in copyrighted architectural plans registered as technical drawings only; however, infringement may be found were copyrighted plans are misappropriated by someone who then builds from those misappropriated plans. *Robert R. Jones Assoc.* 858 F.2d at 280. Morgan admits that he sold copies of his drawings to Seven Fields stating: "Mr. Morgan did not sell his copyrights. He sold copies." According to Hawthorne, because it was a builder in valid possession of technical

22

drawings, it did not commit copyright infringement by building houses from those technical drawings it validly obtained. 3 M. Nimmer 7 D. Nimmer, Copyright, § 2.08 [D][2][a] (2005).

Morgan does not dispute that a technical drawing does not clothe the author with the ability to prevent the construction of the item depicted. Rather, he misreads the holding of *Robert R. Jones Assoc.* Pl.'s Supp. Mem. Of Law in Opp. To M. To Dis. at 5. Morgan alleges that the courts recognize a distinction between using copyrighted technical drawings to build a house and using copyrighted technical drawings to create another copy, then using that copy to construct a house, with the latter constituting copyright infringement. There is no such distinction. *Espiritu*, 284 F.Supp.2d at 435. We find that to the extent that Plaintiff asserts that the act of building these style of homes (Cambridge, Hampton, Wainscot, Oxford or York) from his drawings infringed his copyrights, that claim must be denied as a matter of law. *See Imperial Homes Corp. v. Lamont*, 458 F.2d 895 (5th Cir. 1972) (warning against extending a copyright into a patent, holding that "no copyrighted architectural plans . . . may clothe their author with the exclusive right to reproduce the dwelling pictured"); *Herman Frankel Organization v. Tegman*, 367 F.Supp. 1051 (E.D. Mich. 1973) ("[a] person cannot, by copyrighted plans, prevent the building of a house similar to that taught by the copyrighted plans.)

To the extent that he argues that his plans were copied, that claim, if proved, would establish a violation of the Act. The question whether the defendant in an infringement action "copied" the work of the plaintiff is ordinarily one of the most intractable problems in copyright cases. The solution requires proof that the defendant copied the protected work as a factual matter, and that the allegedly infringing reproduction is "substantially similar" to the protected work. *Segrets, Inc. v. Gillman Knitwear Co., Inc.,* 207 F.3d 56, 60 (1st Cir. 2000). The issue is usually one left to the collective judgment of the jury, which may make comparisons between the putatively protected and the allegedly infringing works. We find that the nature of this inquiry in this case necessitates that we deny summary judgment on the issue.

23

### 3. License for Use

According to plaintiff, the original designs provided by Morgan to Seven Fields had a copyright notice on his title block. Seven Fields would pay for one design and construct multiple homes from it. According to Morgan, Seven fields was granted a limited license for construction purposes but it was not given express permission to transfer its copyright licence to Hawthorne. The essence of Morgan's argument is that Hawthorne reused his plans without paying him, and that he did not have cause to object to the transfer of mylars to Hawthorne (which arguably either affected a transfer of the license that he gave Seven Fields or created an implied license with Hawthorne) until Hawthorne stopped paying Morgan for reuse of his plans. Hawthorne Homes argues that it had a valid license, through the purchase of the assets of Seven Fields, to copy the plans.

A copyright owner may transfer to another person any of the exclusive rights the owner has in the copyright; however, such a transfer must be made in writing. 17 U.S.C. § 204(a); *see also Effects Assocs. v. Cohen*, 908 F.2d 555, 557-58 (9th Cir.1990), *cert. denied*, 498 U.S. 1103 (1991). The "transfer of copyright ownership" is defined, in the Copyright Act, as an exclusive license or some other instrument of conveyance. The definition expressly excludes a nonexclusive license. 17 U.S.C. § 101. Therefore, even though section 204(a) of the Copyright Act invalidates any transfer of copyright ownership that is not in writing, section 101 explicitly removes a nonexclusive license from the section 204(a) writing requirement. We turn, therefore, to the differences between exclusive and nonexclusive licenses.

In an exclusive license, the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others. The licensee violates the copyright by exceeding the scope of this license. The writing requirement serves the goal of predictability and certainty of copyright ownership. *Effects*, 908 F.2d at 557. Under 17 U.S.C. § 204(a), "a transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing

24

and signed by the owner of the rights conveyed or such owner's duly authorized agent." In *Effects Assocs.*, the Ninth Circuit stated:

> The requirement is not unduly burdensome ... The rule is really quite simple: if the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be a Magna Carta; a one-line pro forma statement will do.

*Id.* Several courts have held that a document does not need to include the word "copyright" in order to constitute a valid transfer document. *See Schiller & Schmidt v. Nordisco Corporation*, 969 F.2d 410 (7th Cir.1992); *Kenbrooke Fabrics v. Soho Fashions*, 690 F.Supp. 298, 301 (S.D.N.Y.1988). In *Schiller & Schmidt*, 969 F.2d at 413, the court held that an agreement, which did not include the word "copyright", but whose "wording leaves little doubt that [the alleged transferor] sold all the assets of Spotline Studios, tangible and intangible alike" was sufficient to constitute a transfer under Section 204(a). Although the word "copyright" does not need to be mentioned in a transfer document, the "terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear." *Papa's-June Music v. McLean*, 921 F.Supp. 1154, 1159 (S.D.N.Y.1996). When interpreting facially ambiguous documents, some courts have looked to the surrounding circumstances to clarify the intent of the parties. In *Schiller & Schmidt*, 969 F.2d at 413, for example, the court stated:

> If Bertel retained the copyright on the 18 photos in issue, Ojenus could not make positives from the negatives without Bertel's permission, while Bertel could not have made positives either, because he had given up the negatives. An agreement that by dividing ownership in this way created such a stand-off would be inefficient...and we do not lightly assume that this is what the parties intended...It is true that the Copyright Act requires that assignments be in writing, but we have the writing (the sale agreement between Bertel and Ojenus); the issue is its interpretation.

Any ambiguity concerning the alleged transfer must be interpreted in favor of the original copyright holder in order to satisfy the purpose of Section 204(a). According to the Ninth Circuit, Section 204(a) "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyright work to negotiate with the creator to determine precisely what rights are being transferred and at what price." *Effects Assocs.*, 908 F.2d at 557; *see also Cassway v. Chelsea Historic Props.*, 1993 WL 64633 (E.D.Pa. Mar. 4, 1993) (any ambiguity in

25

the transfer document must be construed in favor of the original copyright holder in order to avoid such inadvertent transfers); *see also Tasini v. New York Times Co.*, 972 F.Supp. 804, 810 (S.D.N.Y.), rev'd on other grounds, 206 F.3d 161 (2d Cir. 2000).

Thus, the requirements for a valid transfer of copyright ownership are simple: a transfer document must be in writing and signed, and it must be clear. "If the parties really have reached an agreement, they can satisfy 204(a) with very little effort." *Radio Television Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 929 (9th Cir. 1999).

By contrast, in the case of an implied nonexclusive license, the licensor-creator of the work, by granting an implied nonexclusive license, does not transfer ownership of the copyright to the licensee. The copyright owner simply permits the use of a copyrighted work in a particular manner. In contrast to an exclusive license, a "nonexclusive license may be granted orally, or may even be implied from conduct." Melville B. Nimmer & David Nimmer, 3 Nimmer § 10.03[A] at 10-40.1; *see also MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 778-79 (3d Cir.1991); *Effects*, 908 F.2d at 558. Nimmer explains that a nonexclusive license "is not expressly provided in the statutory text, but is negatively implied from the fact that a 'transfer of copyright ownership,' which by definition does not include nonexclusive licenses (see 17 U.S.C. § 101) must be by written instrument." 3 Nimmer § 10.03[A] at 10-40.1 n. 19. A nonexclusive license is, therefore, an exception to the writing requirement of section 204. In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing. Although a person holding a nonexclusive license has no standing to sue for copyright infringement, Paul Goldstein, I Copyright: Principles, Law and Practice § 4.4.1.1, at 409 (1989), the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement. *Effects,* 908 F.2d at 559.

The concept of an implied nonexclusive license has been recognized not only by Nimmer, a preeminent treatise on copyright law, but also by the courts, which universally have recognized that a nonexclusive license may be implied from conduct. Indeed, implied licenses are like implied

26

contracts, which are well recognized in the field of architecture. We note that the Ninth Circuit, in *Effects*, held that an implied nonexclusive license has been granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work. *Effects*, 908 F.2d at 558-59.

*Effects* suggests several objective factors to guide the judicial inquiry as to whether an implied license exists: the language of the copyright registration certificate, the letter agreement, and deposition testimony; and the delivery of the copyrighted material without warning that its further use would constitute copyright infringement. *Effects*, 908 F.2d at 559 n. 6. When we apply these factors to the circumstances before us, we conclude that we must deny Defendant Hawthorne Homes's motion for summary judgment in this regard. Morgan admits that Seven Fields requested that Morgan produce these drawings, paid Morgan for their production, and that Morgan turned over the mylars to Seven Fields. The plans were drawn in several variations to permit building of multiple homes.

However, there is evidence that the drawings were accompanied by a copyright notice and what appears to be an express license agreement, which states:

> The purchaser of these plans is given a limited license to reproduce these plans for construction purposes only and any other further distribution and or transfer is strictly prohibited unless given express permission.

Craig testified at his deposition that when the drawings were transferred from Seven Fields to Hawthorne Homes, Morgan never gave written express authority for the transfer of those drawings. According to Morgan, when he was hired as an independent contractor for Seven Fields, the basic plans were used over and over again. He revised the plans as needed, to meet local building conditions, and was paid every time a house was built according to the number of square feet in the floor plan. He claims that he allowed Seven Fields to build homes from his designs as many times as they wanted, so long as he was paid every time a house was built.

An implied nonexclusive license is transferable. *NASCR, Inc. v. Scharle*, 356 F.Supp.2d

27

515, 528 (E.D. Pa. 2005). Morgan wrote to Darrell Craig prior to the asset purchase by Hanna Holdings, and stated that he would like to negotiate compensation to Concept Residential Designs before the plans or designs were to be used by anyone other than Seven Fields. He has produced a letter in which he wrote:

> As the merger and or acquisition of Seven fields Development/Hawthorne Construction become inevitable by Howard Hanna, you must remember, the only company permitted to use my plans, designs and or mylars is Seven Fields Development, for advertising and or for potential clients. AT NO time, does any plans, designs and or mylars TRANSFER, to be DISTRIBUTED and or used by ANYONE other than Seven fields Development. If, when the time comes that Seven Fields no longer exists and Howard Hanna wants to use my plans, designs or mylars, they can use them on an agreed upon fee.

Ex F. to Hawthorne's Concise Statement of Material Facts. After the acquisition on January 2, 2001, Morgan admits that Hawthorne Homes hired him and paid for certain of his plans; he was paid for houses until October 17, 2001 and for townhouses until January 30, 2003.

The intent to waive the express consent provision of the license between Randy Morgan and Seven Fields remains at issue, although we note that there is some compelling evidence that Morgan knew about the transfer at the time it was occurring because he admitted that the transfer of plans was necessary so that he could continue to work for Hawthorne. There is no dispute that he continued to perform the same work for Hawthorne. Such action on behalf of Morgan, if shown, will be considered by the factfinder when deciding if he intended to waive the necessity of his express permission, that he gave his implied consent. There is evidence that Morgan intended that Seven Fields build multiple copies from his plans, however, the license agreement that Morgan provided to Seven Fields and was sold to Hawthorne does not appear to include any requirement of payment for reuse, nor does it appear to require that Morgan be utilized in the further reproduction of homes from his drawings.

Accordingly, because genuine issues of material fact exist, we will deny Hawthorne's motion for summary judgment with respect to its claim that it held an implied non exclusive license, and we will deny plaintiff's motion for summary judgment as to the question of copyright infringement..

## 4. Hanna Holdings

Hanna Holdings has also filed a motion for summary judgment. In it, Holdings asserts that if we conclude that Plaintiff does not have a valid copyright in the drawings or that it was not infringed, we must grant summary judgment in favor of both defendants. Having denied summary judgment in favor of Hawthorne, we will address Holdings' alternative arguments: that we must grant summary judgment in its favor because there is no evidence to support a claim of direct infringement, that it is not liable for the actions of its wholly owned subsidiary Hawthorne Homes, and that the complaint fails to allege a prima facie case of either vicarious or contributory infringement as to this defendant. In response, Morgan argues that there is a material issue of fact as to whether Hanna Holdings was an infringer. Morgan asserts that Hanna Holdings distributed the drawings to Hawthorne Homes without his consent, and that this constitutes direct infringement, and insofar as Hanna Holdings allegedly directed the infringing work, we should find contributory infringement. We will grant summary judgement in favor of Hanna Holdings.

### a. Direct infringement

Plaintiff asserts that Holdings purchased the assets from Seven Fields. His theory is that Holdings then distributed the drawings to Hawthorne Homes without his consent, in violation of the copyright holder's exclusive right to distribution. 17 U.S.C. 106(3). Holdings argues that it did not purchase and transfer the assets. The evidence shows that the assets from Seven Fields were assigned to two subsidiaries in the following manner: Bayard Crossings, Inc. received the real estate assets, and Hawthorne Homes was assigned the non-real estate assets, including drawings. In order to find Holdings directly liable for copyright infringement, it argues, Morgan must prove that Holdings copied his works, citing *MacLean v. Wm. M. Mercer-Meidinger-Hansen, Inc.,* 952 F.2d 769, 780 (3d Cir. 1991).

To the extent that Holdings argues that plaintiff has failed to adequately plead the theories of direct, vicarious, and contributory infringement, we will deny the motion on the grounds that if a complaint is vulnerable to dismissal, we must permit a curative amendment, unless an amendment

29

would be inequitable or futile. *Alston v. Parker*, 363 F.3d 229, 235-36 (3d Cir. 2004).

As for his claim that Holdings directly infringed his copyrights, we will grant summary judgment in favor of Holdings. The evidence is undisputed that at the time of the purchase of the assets of Seven Fields, Holdings assigned the right of purchase to Bayard Crossings Corporation and Hawthorne Homes Company; Hawthorne purchased the homes in progress, construction equipment, and intellectual property. When asked in depositions, Holdings employees, including its treasurer David Lloyd and chairman and CEO Howard Hanna, III, consistently corrected counsel to Morgan's mischaracterization of the asset purchase. When asked about which year "Hanna Holdings purchased assets from Seven Fields Development" Lloyd corrected, "[t]he assets were actually purchased by Bayard Crossings and what was then Hawthorne Construction Company." (Lloyd Dep. dated Oct. 9, 2006 at 7). Morgan's attorney similarly asked if Mr. Hanna could answer questions relative to the "purchase of assets of Seven Fields by Hanna Holdings," and Mr. Hanna likewise corrected his characterization. (Dep. Howard W. Hanna, III at 6.) Moreover, Seven Fields Development Company was the original developer of the Seven Fields property and Howard Hanna Real Estate Services was the exclusive listing agent for Seven Fields throughout the nineties. There was no change when Bayard Crossings, Inc. and Hawthorne Homes, Inc. acquired the real estate and property of Seven Fields; Howard Hanna Real Estate Services continued as the exclusive listing agent under the same terms and conditions. It is uncontested that Howard Hanna Real Estate Services was in lawful possession of Morgan's drawings throughout the nineties; its possession of those drawings does not constitute distribution from Hanna Holdings so as to constitute direct infringement. There being no genuine issue of material fact, we will grant Holdings' motion for summary judgment as to direct infringement.

One infringes contributorily by intentionally inducing or encouraging direct infringement, *see Gershwin Pub. Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971), and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it, *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir.

30

1963). Although "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," *Sony Corp. Of America v. Universal City Studios, Inc.*, 464 U.S. 417, 434 (1984), these doctrines of secondary liability emerged from common law principles and are well established in the law. *Id.* at 486 (Blackmun, J., dissenting); *Kalem Co. v. Harper Brothers,* 222 U.S. 55, 62-63,(1911); *Gershwin Pub. Corp.*, 443 F.2d at 1162; 3 M. Nimmer & D. Nimmer, Copyright § 12.04[A] (2005).

## b. Vicarious infringement

There are two elements to a successful claim of vicarious copyright infringement: (1) "the right and ability to supervise the infringing conduct" and (2) " 'an obvious and direct financial interest in the exploitation of copyrighted materials.' " Nimmer, supra, § 12.04[A][1] (quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir.1963)). For a parent corporation to be held vicariously liable for a subsidiary's infringement, (1) the parent must have 'the right and ability to supervise'; and (2) the parent must have a direct financial interest' in the profits from the infringing activity." *Banff Ltd., v. Limited, Inc.*, 869 F.Supp. 1103 (D.N.Y. 1994) (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963)). "A defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit from another's infringing activity and 'has the right and ability to supervise' the infringing activity." *Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir. 2004) (quoting *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001)).

Plaintiff directs us to an unreported case from the Northern District of Illinois for the proposition that the legal relationship between parent and subsidiary, alone, always satisfies the test for vicarious liability. *Broadcast Music, Inc. v. Hartmarx Corp.*, 1988 WL 128691 (N.D.Ill. 1988) ("[i]t is the existence of the right to supervise, not whether [the parent] in fact chose to exercise that right, that is at issue"). However, other courts have rejected the *Hartmarx* holding, noting instead the mere potential to influence inherent in the parent-subsidiary relationship is inadequate to ground vicarious liability for infringement. *Banff Ltd. v. Limited, Inc.*, 869 F. Supp. 1103 (S.D. N.Y. 1994).

31

Morgan points to no facts to support a conclusion that Holdings has the right and ability to supervise the acts of alleged infringement by Hawthorne, to control how Hawthorne built homes, who Hawthorne sold homes to, what they were sold for, or where they were built. There is no evidence that Holdings could direct the use of the drawings on the website and the construction of homes from the drawings. "[A] parent corporation can be liable only if there is a substantial continuing involvement by the parent specifically with respect to the allegedly infringing activity of the subsidiary." *Dauman v. Hallmark Card, Inc.,* 1998 WL 54633 * 6 (S.D.N.Y. 1998).

Morgan argues that Holdings is part of a consolidated tax return that reports the profits of all subsidiaries, but he has not provided us with any caselaw to support such a position. We note that the fact that a parent company benefits financially by virtue of its ownership of the subsidiary is insufficient to support a claim of direct financial benefit; there is no evidence that Holdings has directly benefitted from the sale of allegedly infringing homes or that it was involved in any way with the day -to-day affairs of its subsidiaries. As the court explained in *Banff,* "there must be indicia beyond the mere legal relationship showing that the parent is actually involved with the decisions, processes, or personnel directly responsible for the infringing activity." 869 F.Supp. at 1109. We therefore find that Holdings cannot be held vicariously liable for the alleged infringement on the part of its subsidiary Hawthorne Homes.

## c. Contributory infringement

Next, Holdings argues that Morgan has not alleged or shown that Holdings knew or had reason to know of the allegedly infringing activity and induced, caused, or materially contributed to the infringing conduct. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* 545 U.S. 913 (2005). According to Morgan, "one who distributes a device with the object of promoting its use to infringe a copyright, as shown by clear expression or other affirmative steps to foster infringement, is liable for the resulting acts of infringement to third parties." *Id.* Morgan argues that Hanna Holdings distributed drawings and is therefore contributorily liable. We disagree. The law requires more than mere distribution. Holdings merely arranged the purchase of the assets of Seven Fields and

32

assigned that right of purchase to its subsidiary, Bayard Crossings. Other than the assignment, Holdings took no part in the business of Hawthorne and did not participate in the construction of homes. The record is clear that Hawthorne is responsible for building the homes in which Morgan claims he owns a copyright, and there is no evidence to support the notion that Hawthorne is anything but an independent corporate entity. Nor is there evidence in the record to support that Holdings had any intent to infringe or has taken affirmative steps to foster that intended infringement. *Id.* at 919. There is also no genuine issue of material fact that Holdings had no knowledge of the fact that the alleged actual infringement was occurring. *Perfect 10 v. Google, Inc.*, 416 F.Supp.2d 828 (C.D. Ca. 2006). We will therefore grant summary judgment in favor of Hanna Holdings as to contributory infringement.

## C. Motion to Sever Amended claims

Morgan has filed a second copyright infringement complaint at Civil Action No. 07-803 ("the Second Action"). The Second Action was filed after we denied his request on July 26, 2006 to file a second amended complaint in the present matter (C.A. 04-1804, or "this action"), a request which was filed after the close of discovery and after defendants had filed motions for summary judgment and extensive briefs in support. Morgan filed the Second Action on June 14, 2007, alleging violations of the same 8 drawings identified in this action, plus the five that we would not permit him to add by way of amendment. The Second Action is against Holdings, Hawthorne, Bayard Crossings, Inc., Howard Hanna Real Estate Services, Inc. Howard Hanna Mortgage Services, Inc. and Barristers Land Abstract, Inc., all subsidiaries of Holdings, as well as Pitell Contracting and Palm Properties. The Second Action alleges that Hanna Holdings, Hawthorne Homes, and Howard Hanna Real Estate Services have directly infringed on the copyrights by the copying and distributing drawing, creating derivative works, and constructing and selling homes. The remaining subsidiaries are alleged to have infringed Morgan's copyrights vicariously and contributorily. Amended Complaint at C.A. 07-803, ¶ 23. The defendants in the Second Action

33

have filed motions to dismiss, which remain pending.

Plaintiff has filed in the present action a "Motion for Leave to Amend the Complaint, Sever the Amended Claims, and Join the Severed Claims with the Related Action filed Under Civil Action 07-803 with direction that the Filing Date of the Newly Joined Claims will Related Back to the Filing Date of Civil Action 04-CV-1809" (Doc. 166). Defendants have a filed a brief in Opposition. (Doc. 168). Essentially, Morgan seeks permission to amend his amended complaint in the present action to include the infringement of five more house designs, to sever those new claims, and join those claims with his second copyright action C.A. 07-803, and finally for a separate order directing that those claims be joined would relate back to the original date of filing of this action. The claims he wishes to add in this present action, and sever and join to the Second Action, are already a part of that Second Action and are subject to motions to dismiss. The drawings at issue are now registered as architectural works. Defendants aver that "Morgan filed that motion in an attempt to get an order relating his claims made at [the Second Action] back to the filing date of [this action], as he realized the second-filed action had significant statute of limitations problems." Response to Pl.'s M. to Consol. Cases (Doc. 171) at ¶ 8. Defendants correctly note that the five additional copyrighted drawings (which we would not permit him to include after the close of discovery and the filing of the motions for summary judgment) appeared on Morgan's own Exhibit 1 to the Complaint in the present action. As defendants see it, "[t]he Motion to Amend, Sever, and Join, which is still outstanding [in the present action], is essentially a repeat of Morgan's Motion to Amend his Complaint previously denied by this Court." Resp. To Pl.'s M. to Consol. Cases (doc. 171) at ¶12.

Fed. R. Civ. P. 15 (c) states: "An amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; [or] (B) the amendment assets a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15 (c)(A), (B). The United States Court of Appeals for the Third Circuit has held that

34

"[r]ule 15(c) does not permit a complaint filed in one civil action to relate back to a complaint filed in a separate civil action." *U.S. ex rel. Malloy v. Telephonics Corp.* 68 Fed.Appx. 270 (3d Cir. 2003); *see also Velez-Diaz v. U.S.*, 507 F.3d 717 (1st Cir. 2007); *In Re DirecTV, Inc.*, 344 F.Supp.2d 647 (D.Ariz. 2004) (refused request to relate back second action to filing date of second action where second matter based on same cause of action against same defendants). Accordingly, we will deny plaintiff's request.

Morgan has also filed "Motion to Consolidate" both cases (Doc. 170) to which Defendants have filed a Response (Doc. 171). Defendants correctly note that none of the eight defendants in the Second Action have yet to file an answer, and there are 3 separate motions to dismiss pending. Moreover, the Second Action has several defendants who are not involved in the present action, and defendants assert that it would be unfair to them to intertwine their respective cases with the first-filed lawsuit, which they are not even involved in, and subject them to increased cost which would necessarily result from these cases being consolidated. Defendants aver that "[t]e present Motion to Consolidate appears to be a fail-safe in the event that this Court denies Morgan's Motion to Amend, Sever, and Join, giving Morgan another opportunity to have these cases heard together. In essence, the present motion is Morgan's third bite at the apple in trying to get all of his claims heard as part of the first action, in an attempt to circumvent the statute of limitations, when this Court made it clear on July 26, 2006 that Morgan could not do so because of his own failure to act promptly." Resp. to Pl.'s M. to Consol. at ¶ 13, 14.

We have broad discretion to consolidate actions involving common questions of law or fact for trial or pretrial purposes if it will facilitate the administration of justice. See Fed. R. Civ.P. 42(a); *Katz v. Realty Equities Corp. of New York*, 521 F.2d 1354, 1358 (2d Cir. 1975); *Mylan Pharmaceuticals Inc. v. Henney*, 94 F.Supp.2d 36, 43 (D. D.C. 2000) (consolidating patent actions for pretrial purposes); *Magnavox Co. v. APF Electronics, Inc.*, 496 F .Supp. 29, 32 (N.D. Ill.1980) (Rule 42(a) contemplates consolidation for pretrial purposes). Consolidation may by ordered on the motion of a party or sua sponte and in spite of the parties' opposition. *See Ellerman Lines, Ltd. v.*

*Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir.1964) (court may consolidate cases on its own initiative); *Mylan*, 94 F.Supp.2d at 44-45 (court may consolidate sua sponte over parties' objection); *Sage Products, Inc. v. Devon Industries, Inc.*, 148 F.R.D. 213, 215 (N.D. Ill.1993) (parties do not have to consent to consolidation, citing, 9 C. Wright, A. Miller & E. Cooper, Federal Practice § 2383 (1986)).

We will deny the motion to consolidate without prejudice. It is simply too early to tell if consolidation of the present action with the Second Action will necessarily facilitate the administration of justice.

## IV. Conclusion

For the reasons stated herein, we will deny plaintiff's motion for partial summary judgment, grant defendant Hanna Holdings' motion for summary judgment, and will grant in part and deny in part the Hanna Defendants' motion for summary judgment. We will deny plaintiff's request to amend, sever, and relate back, and will deny without prejudice his request to consolidate these cases.

An appropriate order will be entered.


Date: _April 14, 2009_          _Maurice B. Cohill, Jr._
                                Maurice B. Cohill, Jr.
                                Senior United States District Judge


cc:    Counsel of record

36